UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TRACEY H.,

                Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                Defendant.

**DECISION AND ORDER**
23-CV-461-A

---

### I.    Background

The Plaintiff Tracey H. brings this action against the Commissioner of Social Security (hereinafter the "Commissioner"), seeking judicial review of the Commissioner's determination denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, pursuant to Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C., Chapter 7, respectively. T. 68-69; 77-78.[1] Plaintiff (ECF 8) and Defendant (ECF 11) filed cross-motions for judgment on the pleadings, and Plaintiff replied. (ECF 12). For the reasons set forth below, plaintiff's motion for judgment on the pleadings (ECF 8) is **GRANTED** to the extent that this matter is remanded to the Commissioner for further administrative

---

[1] References herein preceded by "T" are to Bates-stamped pages in the 764 page, consecutively paginated administrative transcript of official proceedings in this case, set forth at ECF 5 on the Docket.

proceedings consistent with this Decision and Order. The Commissioner's opposing motion for judgement on the pleadings (ECF 11) is **DENIED**.

### A. Procedural Background

On September 3, 2020, Plaintiff protectively filed for DIB and SSI alleging disability as of December 10, 2019. (T. 66-67, 68).  On November 17, 2020, Plaintiff's application was initially denied, and thereafter, Plaintiff, on April 15, 2021, unsuccessfully sought reconsideration.  (T. 128, 150. 164).  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("the ALJ"), and on March 24, 2022, ALJ Stephen Cordovani held a hearing at which Plaintiff, represented by counsel, and a vocation expert testified. (T. 29-65). On May 10, 2022, the ALJ rendered a written decision finding that Plaintiff was not disabled under the SSA. (T. 10-23).  On April 18, 2023, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-6). This action ensued.

### B. Factual Background

On January 2, 2019, Plaintiff underwent a C3-T2 posterior cervical instrumented fusion revision, following prior back procedures that she previously had in 2015 and 2017. T. 407. Dr. Kevin Gibbons, who performed the January 2019 procedure noted that Plaintiff tolerated the procedure well, without any complications, and had strength of 5/5 in all her extremities.  *Id.*  Specifically, the procedure, which lasted less than an hour, involved the examination and revision of

posterior cervical thoracic hardware, with removal and replacement of screws at C3 and T1, replacement of screws at T2, and revision instrumentation at C3-T2. T. 429. Her pain was controlled with oral pain medication and improved over the course of her hospitalization. T. 407. Plaintiff was discharged from the hospital on January 3, 2019, and instructed to avoid all strenuous activity until her follow-up appointment, with no lifting of anything greater than five pounds, no bending or twisting, and wearing her collar at all times. T. 407-408.

Over the next 23-months, Plaintiff underwent numerous follow-up visits with both nurse practitioners (NPs) and physician's assistants (PAs) at the Office of her primary care provider, Dr. Michael D. Calabrese, MD, at Medical Care of Western New York at Buffalo ("Medical Care") T. 547, 741, 754, 764. Upon examination, Plaintiff was noted to be "healing well so far," she walked with a guarded antalgic gait, with the collar in place. *Id*. Plaintiff further reported that Xanax continued to be effective in decreasing acute anxiety. *Id*. During a follow-up visit with a physician's assistant (PA) at Medical Care in February 2019, Plaintiff rated her pain as a 9/10. T. 541. In March 2019, Plaintiff told the PA she saw during her visit to Medical Care that she continued to have anxiety triggered by stress and pain. T. 539. She reported that sometimes onset of her anxiety was gradual while other times it was sudden. *Id*. She reported that Xanax helped to reduce it, and that she also continued to take Cymbalta. *Id*. In April of 2019, Plaintiff returned to Medical Care and reported that she had a kidney stone in her left kidney, which was found when she went to the emergency department earlier in the month. T. 535. Plaintiff continued to complain of

3

pain in her cervical spine and rated it as a 6/10 that day. *Id*. Upon examination, Plaintiff's cervical spine movements were slow and deliberate. *Id*. During a May 2019 visit, Plaintiff told the PA who treated her that her pain was 4/10. T. 531. Upon examination, Plaintiff's cervical spine movements were slow and deliberate. *Id*. Her cervical spine range of motion measurements were 15 degrees flexion, 10 degrees extension, 15 degrees right lateral flexion, 15 degrees left lateral flexion, 10 degrees right rotation, 10 degrees left rotation1. *Id*. A month later, in June of 2019, Plaintiff reported that her cervical spine was feeling "really good" and rated her pain at a 4/10. T. 527.

In July of 2019, Plaintiff reported that she continued to have anxiety triggered by stress, being outside the home in crowded places, and that she experienced muscle spasms in her chest. T. 523. Plaintiff reported that Xanax helped to improve her symptoms. *Id*. Examination revealed that she walked with a mild antalgic gait and had guarded neck movements. *Id*. While Plaintiff complained of pain in her cervical during her August 2019 visit, T. 519, in September of 2019, Plaintiff reported that she was hoping to be released by Dr. Gibbons to physical therapy soon so that she could regain some of her function and strength. T. 516. Plaintiff continued to exhibit a limited range of motion. *Id*. In October of 2019, Plaintiff reported increased depression. T. 512. She reported difficulty getting to her appointments and that she had missed a follow up appointment with Dr. Gibbons and a mammogram and gynecologist appointment due to transportation issues. *Id*. She also complained of increased numbness and decreased sensation in her hands that was worsening. *Id.*

She also reported that she had difficulty sensing heat and had almost burned herself on numerous occasions. *Id*. Upon examination, Plaintiff's cervical range of motion was about 25-50% throughout. T. 513.

During a November 25, 2019, Plaintiff complained of bilateral wrist pain and hand pain that was sharp, aching, with weakness and cramping with any type of grabbing, and grasping. T. 509. She also reported limited manipulation with her hands and that she had a pain level of 8/10. *Id*. She noted that gabapentin helped to reduce her symptoms but it made her tired. *Id*. She also advised that another doctor had recently diagnosed her with possible carpal tunnel release and recommended surgery. *Id*. Her examination revealed a mild antalgic gait and decreased grip strength. *Id*.

On December 17, 2019, Plaintiff returned to Medical Care with complaints of chronic pain and anxiety. T. 505. Plaintiff's chronic pain was located in her neck and bilateral wrists. *Id*. She complained that her neck was stiff, and that she had sharp pain, muscle spasms, and radiating pain down her right shoulder and arm. Id. She reported pain in wrists with numbness and tingling that was worse on the right than the left. *Id*. Plaintiff rated her pain at 7/10. *Id*. Plaintiff also had some limitation to her cervical spine range of motion but intact motion of her shoulders. *Id*. Her examination revealed a mild antalgic gait and slow and guarded neck movements. *Id*.

On February 21, 2020, Plaintiff reported constant aching ear pain that seemed to be muscle related and radiating from her neck. T. 497. Upon examination,

5

Plaintiff's neck movements were slow and guarded. *Id*. She had right side TMJ, with pain elicited with the opening and closing of her jaw. *Id*. She had some tenderness to palpation along the right side of her neck. *Id*. Her cervical range of motion was limited to 50, 50, 50, 50, 30, 30. *Id*.  During visits in March and April of 2020, Plaintiff continued to complaint of anxiety triggered by stress and worry. T. 493, 489. During July of 2020, Plaintiff reported continued chronic neck pain. T. 485. Upon examinations in July through October of 2020, Plaintiff showed decreased range of motion by 25-50% throughout her cervical spine. *Id*.; *see also* T. 482, 479, 659.

Plaintiff's complaints of pain also persisted. T. 659.  Plaintiff continued to exhibit a decreased range of motion and an antalgic gait during her visits in October and November of 2020. T. 659, 655.

On December 21, 2020, Plaintiff complained of continued neck pain and anxiety, and upon examination, Plaintiff's neck movements were guarded and she once again exhibited limited cervical range of motion. T. 651.

Following a fall in late 2020/early 2021, Plaintiff began experiencing issues with her right knee.  T. 734, 730.  In February 2021, Plaintiff reported four falls in the past month based upon her knee frequently giving out. T. 730. She also exhibited an antalgic gait, favoring her right knee, and once again exhibited limited cervical spine range of motion. *Id*.  During both her February and March 2021 visits, Plaintiff complained of knee pain and continued to exhibit limited range of motion of the cervical spine and right lower extremity.  T. 727.

In April of 2021, Plaintiff continued to complain of chronic pain in her neck that was aching and throbbing in nature and worse with certain position changes. T. 723. Plaintiff also reported continued right knee pain, although she reported that her knee pain was improving. *Id*. Once again Plaintiff exhibited a limited range of motion in her right knee and cervical spine. *Id*.

Plaintiff's complaints of neck pain and demonstration of slow and guarded neck movements were also documented during various visits to Medical Care in July (during which Plaintiff described the pain as 10/10), August, September, and December of 2021. T. 712, 708, 704, 693. Upon examination, her range of motion limitations were also noted during those visits. *Id*.

### C. The ALJ's Decision

The ALJ determined, under step one, that Tracey H. had not engaged in substantial gainful activity since December 10, 2019. T. 16. Under step two, the ALJ determined that Tracey H. had the following severe impairments: cervical spine impairment and obesity (20 C.F. R. 404.1520(c) and 416.920(c)). T. 16-18. The ALJ further determined that Tracey H.'s impairments did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). T.18-19. In addition, the ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she could occasionally climb ramps and stairs; frequently balance as that term is defined in the SCO; frequently stoop; occasionally kneel, crouch, and crawl, but could not climb

ladders ropes scaffolds but she could occasionally push, pull, and overhead reach. T. 19-21.  Finally, the ALJ determined that Plaintiff was capable of performing past relevant work as a sandwich maker (DOT 317.667-010, light, SVP 2), as such work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). T. 21-23.

### D.  The Parties' Contentions

In seeking this Court's review of the ALJ's determination, Plaintiff argues the ALJ: (1) failed properly to evaluate the disability-supporting opinion of Plaintiff's primary care physician, Dr. Calabrese; and (2) adequately to explain why he omitted functional limitations from the RFC finding related to Plaintiff's severe cervical spine impairment that were well-supported in the record. ECF 8-1.  In that regard, Plaintiff argues that the ALJ failed adequately to discuss the supportability and consistency factors in evaluating the opinion where he ignored nearly all of Plaintiff's treatment records from her primary care office, which supported Dr. Calabrese's opinion. Plaintiff further argues that the ALJ also made factually inaccurate statements when explaining why he wholly rejected Dr. Calabrese's opinion, and failed to build an accurate and logical bridge connecting the evidence to his conclusions regarding the RFC.  Thus, Plaintiff asks this Court to remand the case for the proper consideration of the evidence of record and development of an RFC finding that is supported by substantial evidence.

Defendant argues that there was no error and that the ALJ's decision should be affirmed.  ECF 11.

## II.    Legal Standard

### A. Standard of Review

In reviewing a final decision of the SSA, a district court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It is not this Court's function to make a *de novo* determination as to whether the claimant is disabled; rather, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn" to determine whether the SSA's findings are supported by substantial evidence. *Id*.

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *42 U.S.C. § 405(g)*; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)("Congress has instructed ... that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive."). "Under this 'very deferential standard of review,' 'once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.'" *Bonet ex rel. T.B. v. Colvin*, 523 Fed.Appx. 58, 58-59 (2d Cir. 2013) (italics omitted) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The issue is not whether substantial evidence supports the

claimant's argument, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B.*, 523 Fed.Appx. at 59 (italics omitted).

### B. Legal Standard To Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. See 20 C.F.R. § 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The five-step process is as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). In considering a disability benefits determination, the ALJ has an affirmative duty to develop the record. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Where the ALJ fails to develop the record, remand is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.1999). The ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (citation omitted).

**C. Legal Analysis**

Plaintiff first argues that the ALJ's evaluation of certain medical evidence was flawed. ECF 8-1, pp. 14-19.  Specifically, she argues that the ALJ erred in failing properly to evaluate the disability-supporting opinion of Plaintiff's primary care physician, Dr. Calabrese, and essentially ignoring various treatment records from Dr. Calabrese's practice—Medical Care—which supported his opinion.

In that regard, the Court notes that the ALJ's decision, his mention of Dr. Calabrese's opinion regarding Plaintiff's condition(s) and the medical records provided by his practice consisted on the following single paragraph:

> On February 28, 2022, treating source, Dr. Calabrese completed a physical RFC questionnaire.  Nonetheless, he/she opined that he/she has treated the claimant every 1-3 months for neck, right shoulder, and bilateral wrist pain. Dr. Calabrese stated that the claimant would be capable of low stress jobs, but incongruently stated that the claimant has pain/mental health issues, as well as other symptoms that would constantly interfere with her ability to maintain attention and concentration, would be well below sedentary work. Dr. Calabrese opined that the claimant would miss up to four days of work per month. I find this opinion totally unpersuasive as it is not supportable and not consistent with the treatment records (there are minimal treatment records from orchard park health) (See Exhibits B1F, B3F, B4F, B10F, B17F and B18F) because none of these documents detail any physical limitations. I find it not persuasive as it is not consistent with activities or treatment record. While the claimant certainly has issues, the record does not evidence that they are as consistently severe as reported.

Tr. 20-21.

Notwithstanding the ALJ's characterization above, the treatment records from Dr. Calabrese's Office—Medical Care—consist of over 35 separate medical visits that Plaintiff had there and account over two-thirds of the medical records in the administrative record. T. 477-631, 649-69, 688-748.  The records repeatedly

documented Plaintiff's antalgic gait and significantly reduced range of motion of her cervical spine, as well as her complaints of chronic pain in her neck and wrists. *See, e.g.*, T. 479, 482, 485, 497, 505, 651, 655, 659, 693, 708, 716, 719, 730.  The ALJ's reference to "minimal treatment records from orchard park health" is inexplicable as there are absolutely no records from "orchard park health" anywhere in this 768-page record.  For the ALJ to conclude that Dr. Calabrese's opinion ought to be rejected as "totally unpersuasive" on the grounds that it was "not supportable and not consistent with the treatment records…because none of these [treatment records] detail any physical limitations"—where the treatment records to which the ALJ was referring are not even part of the record, constitutes error.  First, the relevant treatment records from Dr. Calabrese were records from "Medical Care" not "orchard park health" as indicated in the ALJ's decision.  Second, and even if the ALJ simply got the name wrong and was, in fact, referring to the Medical Care records—as opposed to records from "orchard park health"—it is simply incorrect to assert, as the ALJ did, that "none of these documents detail any physical limitations." In fact, such records, on their face at least, document numerous physical limitations. While such records may not, as the ALJ goes on to determine, ultimately document "symptom severity to the degree that would prevent claimant from all work activity" (T. 21), this Court, on the record as it presently exists, cannot confidently conclude that the ALJ did not "ignore[ ] or mischaracterize[ ] medical evidence or cherry-pick[ ] evidence that supports his RFC determination while ignoring other evidence to the contrary." *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y.  2022).

Moreover, while finding Dr. Calabrese's opinion to be "totally unpersuasive," the ALJ did find "generally persuasive" the opinion given by Dr. Abrar Siddiqui following his consultative physical examination of Plaintiff on March 23, 2021.  T. 20.  Once again, on the record before it, this Court cannot confidently conclude that substantial evidence supports that determination. In this instance, the reason for the Court's skepticism is—although unmentioned by either party—another seemingly inexplicable discrepancy in the record.  Specifically, in his decision, the ALJ expressly noted that Dr. Siddiqui had determined "that the claimant was not obese (weighed 144 pounds and stood 5'7")." T. 20.  Elsewhere in his decision, however, the ALJ found that Plaintiff was, in fact, obese and that such condition constituted a "severe impairment." T. 16, 18-19.  Adding to the confusion is the fact that while Dr. Siddiqui's report indicates that on March 23, 2021, Plaintiff measured 5'7" and 144 lbs., *see*, T. 678, the records from Medical Care show that just before and just after Dr. Siddiqui's March 23rd examination of Plaintiff, on both March 18, 2021, and March 23, 2021, Plaintiff measured 5'9"" and 239 lbs. *See*, T. 726, 722.

In view of these discrepancies in the record, this Court is unable to determine whether the ALJ's determination is supported by substantial evidence.  *Crowley v. Berryhill*, No. 1:16-CV-00393-MAT, 2018 WL 5784513, at *3 (W.D.N.Y. Nov. 5, 2018) (irreconcilable internal inconsistency in the ALJ's decision warrant remand). While conflicts in the medical evidence are generally for the ALJ to resolve, *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002), the ALJ must "set forth with sufficient

13

specificity" the crucial factors they relied on to come to their conclusion. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).

Under the regulations applicable to Plaintiff's claims, the ALJ must consider the persuasiveness of the medical opinions of record, and "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). When a medical source provides one or more medical opinions, the Commissioner will consider the medical opinions from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of the applicable sections. *Id*. Those factors include: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id*. at §§ 404.1520c(c), 416.920c(c).

When evaluating the persuasiveness of a medical opinion, the most important factors are supportability and consistency. *Id*. at §§ 404.1520c(a), 416.920c(a). With respect to "supportability," "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(1), 416.920c(c)(1). With respect to "consistency," "[t]he more

14

consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Where, as here, the record contains highly contradictory evidence, "[T]he ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022). The problem here, is that although the record establishes that the ALJ, at least in part, relied upon Dr. Siddiqui's opinion to refute the opinion offered by Dr. Calabrese, the record fails to establish: (1) whether the Plaintiff's treatment records from Dr. Calabrese's medical practice were the same treatment records considered by the ALJ in reaching his decision; and (2) whether the person (presumably Plaintiff) examined by Dr. Siddiqui was, in fact, the same person being treated by Dr. Calabrese and Medical Care. Accordingly, this Court is unable to determine, on the record as a whole as it presently exists, whether substantial evidence supports the ALJ's conclusion, and the ALJ's failure to reconcile the inconsistent evidence before him makes it impossible for this Court to determine whether substantial evidence exists. *See, Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013).

While it is not error for an ALJ to give only partial weight to all of the medical opinions of record and make an RFC finding based on the record as a whole, the ALJ may not "ignore[ ] or mischaracterize[ ] medical evidence or cherry-pick[ ] evidence that supports his RFC determination while ignoring other evidence to the contrary." *Jackson v. Kijakazi*, 588 F. Supp. 3d at 585. Because of these unexplained inconsistencies—both within the ALJ's decision and between the decision and the administrative record—the ALJ has failed to provide a decision that permits the Court to conduct a meaningful review. *Crowley v. Berryhill*, No. 1:16-CV-00393-MAT, 2018 WL 5784513, at *3 (W.D.N.Y. Nov. 5, 2018) Consequently, a remand is warranted.

## III.   CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (ECF 8) is **GRANTED** to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Commissioner's opposing motion for judgement on the pleadings (ECF 11) is **DENIED**. The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED**.

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  June 21, 2024
        Buffalo, New York